UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| MYSTIQUE BRANDS, LLC, | : | Case No.: 13-10187 (SMB) |
| | : | |
| Debtor. | : | |

-----------------------------------------------X

| | | |
|---|---|---|
| ROBERT L. GELTZER as Trustee of | : | |
| The Estate of Mystique Brands, LLC, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| – against – | : | Adv. Pro. No. 15-01121 (SMB) |
| | : | |
| ROYAL WINE CORP., MORDECHAI | : | |
| HERZOG, AARON HERZOG, | : | |
| MICHAEL B. HERZOG, ELI HERZOG, | : | |
| NATHAN HERZOG, MICHAEL | : | |
| HERZOG, JUDITH BUCHLER, | : | |
| GARY HERZOG, MORRIS HERZOG | : | |
| and JOSEPH HERZOG | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------X

## POST-TRIAL FINDINGS OF FACT AN CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

TARTER KRINSKY & DROGIN LLP
*Attorneys for Plaintiff*
1350 Broadway, 11th Floor
New York, New York 10018

     Robert A. Wolf, Esq.
        Of Counsel

SNITOW KANFER & HOLTZER, LLP
*Attorneys for the Defendants*
575 Lexington Avenue, 14th Floor
New York, New York 10022-6102

     Franklyn H. Snitow, Esq.
     Alan V. Klein, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The chapter 7 trustee (the "Trustee") commenced this adversary proceeding
pursuant to 11 U.S.C. §§ 544(b)(1) and 550(a) to avoid and recover an allegedly
constructive fraudulent conveyance in the amount of $421,766 the ("Transfer") to the
defendant Royal Wine Corp. ("Royal"), to recover the subsequent transfer of the
Transfer to the Individual Defendants and to disallow any claims filed by the defendants
pursuant to 11 U.S.C. § 502(d).  The Court conducted a two day trial, and concludes, for
the reasons that follow, that the plaintiff has failed to sustain his burden of proof and
the adversary proceeding is dismissed.

## FINDINGS OF FACT[1]

The Debtor, Mystique Brands, LLC ("Mystique" or the "Debtor") was formed as a
limited liability company in 2005.  At all relevant times, it was engaged in the business
of marketing and selling various alcoholic products.  The defendant Royal Wine
Corporation ("Royal") was also engaged in the business of selling various alcoholic
products.  The Individual Defendants are officers and/or employees of Royal, and were
members of the Herzog family, the ultimate owners of Royal.  The Herzog Individual
Defendants owned membership units in the Debtor, and the defendant Mordechai
Herzog was a member of the Debtor's board of directors.

---

[1]      In this decision, "ECF Doc. No. ___" refers to documents filed on the docket of this adversary
proceeding, "*Complaint*" refers to the *Complaint*, dated July 1, 2015 (ECF Doc. No. 1), "PX" refers to the
Trustee's exhibits, "DX" refers to the defendants' exhibits, "*JPTO*" refers to the *Joint Pretrial Order*, dated
Sept. 15, 2016 (ECF Doc. No. 21), "SF" refers to the Stipulated Facts contained in Part III of the *JPTO*, and
"Tr." refers to the transcript of the September 20, 2016 hearing.  (ECF Doc. No. 24.)

The businesses of the Debtor and Royal were intertwined.  The Debtor lacked the licenses and permits needed to import and sell alcoholic products and lacked the money to store inventory.  Royal served these purposes for the Debtor.  Prior to the transaction that is the subject of this litigation, the Debtor did not purchase or store the liquor it sold.  Instead, Royal purchased inventory at the Debtor's direction, retained title to it, and sold it to third parties at the Debtor's direction.  Furthermore, Royal did not bill the Debtor for the liquor purchased at its direction.  Instead, following a sale to a third party, Royal received the purchase price (it owned the inventory) and paid the Debtor the profit, less a 14% service charge.

In the fall of 2007, the Debtor was cash strapped and had difficulty paying suppliers.  (*See* PX 1.)  In addition, Royal became concerned that it was buying inventory at the Debtor's direction at a faster rate than the Debtor was instructing Royal to sell it. These pressures resulted in two, connected transactions.  First, breaking from the usual way they did business, the Debtor agreed to purchase from Royal some of the inventory purchased by Royal at the Debtor's request.  The Debtor designated specific inventory to be purchased in the aggregate amount of $421,775.  (DX AN).

Second, the Debtor lacked the funds to make the purchase or cover its other operating expenses.  In order to raise additional capital, the Debtor's board authorized it to issue Class B Preferred Units.  Pursuant to the Class B Preferred Unit Purchase Agreement (the "Class B Purchase Agreement") (PX 8), the Debtor sought to raise $1.4 million in two, $700,000 tranches.  The defendants subscribed to purchase $421,765 of Class B Units in the first tranche, an amount approximately equal to the inventory the Debtor had first committed to purchase.

The Class B Purchase Agreement explicitly tied the defendants' participation in the equity raise to the inventory purchase:

> Royal Wine Corporation ("Royal") at its sole discretion may participate in either the Class B First Closing, the Class B Second Closing or both in place of the individual Royal unitholders' participation and in their same pro rata proportion. *Royal will receive a dollar-for-dollar cash credit for certain inventory in an amount equal to its pro rata share of the Class B First Closing, at cost. Royal will purchase Class B Units at the Class B First Closing for cash, such cash which the Company will use to purchase the inventories from Royal.* Such inventory is listed on Exhibit H and has been agreed upon by the CEO of the Company and Enhanced Capital New York Fund III, LLC ("Enhanced Capital") prior to the Class B First Closing.

(PX 8 at § 1.1(d) (emphasis added).)  The italicized language was ambiguous.  The first italicized sentence suggested that Royal would pay for its subscription by delivering inventory.  The second italicized sentence indicated that Royal would pay cash, and the Debtor would use the cash to buy the inventory.[2]

The first tranche closed on December 12, 2007.  Royal funded $421,765 ($10 less than the inventory previously identified), $15,944 on its own behalf and the balance on behalf of the Individual Defendants.  (*See* PX 14.)  The Debtor thereafter made the Transfer[3] to Royal on December 26, 2007, and on December 27, 2007, Royal invoiced the Debtor for the sale of inventory in the amount of $389,461.70.  (PX 16.)  The difference, $32,304.30, resulted primarily from the unavailability of 100 cases of Glencadem liquor ordered by the Debtor, (Tr. at 74:8-20), and generated a credit in the Debtor's favor.  (*See* DX BI.)  The purchase price represented Royal's landed cost

---

[2]    Because of this ambiguity, the Court indicated at a summary judgment conference requested by the defendants that summary judgment would not resolve the dispute.

[3]    The one dollar difference between Royal's aggregate investment and the Transfer apparently resulted from rounding.  (*See* Tr. at 95:13-96:4.)

without profit to Royal.  Royal also agreed that it would reduce its service charge from 14% to 7% in connection with the resale of the purchased inventory, and sell the Debtor's inventory first to the Debtor's designated buyers before any Royal inventory was included as part of the sale.[4]

Although the Class B Purchase Agreement was ambiguous, the parties stipulated that the Class B Purchase Agreement contemplated that the Debtor would purchase inventory from Royal, (SF at ¶ 10), and the evidence demonstrated that the parties treated the transaction as a purchase.  Royal sent an invoice for the purchase, and the Debtor recorded the transaction as a purchase of inventory which it carried as an asset on its books and records.  (*See* PX 22.)  Furthermore, although the credit turned out to be only $29,793.12, (*see* DX BJ), Royal carried a $32,304.30 credit on its books and records, (*e.g.,* DX AQ at 3), and applied it against the Debtor's debt to Royal.  (*Compare* DX AQ at 15 (noting credit) *and* DX AQ at 18 (reflecting application of credit).)[5]

Finally, in January 2008, Royal issued a $500,000 dividend to its shareholders, the Individual Defendants in this case.[6]  The purpose of the dividend was to enable the shareholders to invest in the second tranche of financing.  (PX 28.)  Beginning in late

---

[4]    The purchased inventory remained in Royal's possession because the Debtor did not have a warehouse in which to store it.  Royal did not physically segregate the inventory from its other inventory.

[5]    Royal's monthly statements (DX AQ) reflected the credit as a reduction to the Debtor's debt until November 2008, at which point Royal actually offset and zeroed out the credit.  Royal could not explain why it offset the credit at that particular time.  Nevertheless, the Debtor received value in the form of a $32,304.30 offset against its obligations to Royal.

[6]    The dividend forms the basis of the Trustee's subsequent transfer claims.  While it is unnecessary to resolve this question because the Transfer is not avoidable, the Trustee failed to show that Royal used the proceeds of the Transfer to fund the dividend.  In this regard, from December 1, 2007 through January 31, 2008, between $10 million and $15 million passed through the Royal account that received the Transfer and paid the dividend.  (Tr. at 92:21-93:1.)

January, 2008, Royal and the Individual Defendants contributed an additional

aggregate amount of $421,765 to purchase Class B units in the Debtor.

## CONCLUSIONS OF LAW

### A.    Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding

pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the *Amended Standing Order of*

*Reference*, dated Jan. 31, 2012, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012),

signed by Chief Judge Preska of the United States District Court for the Southern

District of New York.  The adversary proceeding is a core proceeding, *see* 28 U.S.C. §

157(b)(2)(A), (B) and (H), and the Trustee and the defendants have consented to the

entry of final orders or judgments by this Court if it is determined that this Court, absent

consent of the parties herein, cannot enter final orders or judgments in the adversary

proceeding consistent with Article III of the United States Constitution.  (*JPTO*, at Part

II.)

### B.    Fraudulent Conveyance Law

Article 10 of the New York Debtor and Creditor Law ("NYDCL") governs the

avoidance and recovery of fraudulent conveyances, and is made applicable to this

bankruptcy case through Bankruptcy Code § 544(b)(1).  To prevail on a constructive

fraudulent conveyance claim under New York law, the plaintiff must show that the

transfer was made without fair consideration and (1) the debtor was insolvent or was

rendered insolvent by the transfer, NYDCL § 273, (2) the debtor was left with

unreasonably small capital, *id.*, § 274, or (3) the debtor intended or believed that it

would incur debts beyond its ability to pay when the debts matured.  *Id.*, § 275; *see*

*Geron v. Schulman (In re Manshul Constr. Corp.*, No. 97 Civ. 8851, 2000 WL 1228866, at *51 (S.D.N.Y. Aug. 30, 2000); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936 (S.D.N.Y. 1995); *Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Restaurant, Inc.*), 337 B.R. 495, 501 (Bankr. S.D.N.Y. 2006). Although the *Complaint* mentions all three financial tests, (*Complaint* ¶ 32), it refers only to DCL § 274 (the unreasonably small capital test), (*see Complaint* ¶¶ 1, 33), and the Trustee proceeded solely on that theory at trial.

### 1.  Fair consideration

A transferee gives and the transferor receives "fair consideration" *inter alia*, "[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied." NYDCL § 272(a). Royal's good faith is not in issue, and the Debtor received the fair equivalent for the Transfer in the form of inventory worth $389,461.70 (at landed cost) and a credit worth $32,304.30 (a pre-paid asset) that was ultimately offset against the Debtor's antecedent debt to Royal. Accordingly, the Trustee failed to sustain his burden of proving lack of fair consideration.

The Trustee's theory of the case, that Royal contributed the $421,765 in inventory and credit to purchase the Class B Units on behalf of Royal and the Individual Defendants, and the Debtor redeemed the investment through the Transfer two weeks later, is belied by the evidence. Initially, it makes no sense. Under the Trustee's theory, Royal funded the Class B purchase with cash *and* also delivered a like amount of inventory and credit and the Debtor redeemed Royal's investment two weeks later with Royal's own cash. In other words, Royal paid for its own redemption. If the parties

7

intended the inventory to be the investment, no cash would have changed hands. Moreover, Royal made another equity investment in the Debtor six weeks later but there was no corresponding inventory purchase.

Furthermore, the Trustee did not supply any credible evidence that the parties intended anything other than a purchase of inventory. He points to an email dated December 10, 2007 from Jack Loprete, the Debtor's chief financial officer and chief operating officer, to Jon Kaiden of Enhanced Capital asking for confirmation that "you agree with the inventory to be transferred as part of the Royal/Herzog contribution to the B round." (DX BF.) The Trustee ignores the next line which states that "[w]e have also agreed that Royal will pay Mystique for its B units and Mystique will buy the inventory." (*Id.*) In addition, Loprete did not sign the Class B Purchase Agreement, he did not testify regarding the negotiations or the parties' intent and it is not even clear that he would have been competent to do so.

In short, these were two separate albeit connected transactions that the Trustee is trying to collapse. His argument ignores the cash and does not accord with what the parties intended or what they did. In addition, the transaction did not hurt the Debtor's creditors because at the end of the day, the Debtor had $421,765 in inventory and a pre-paid credit without any corresponding increase in its liabilities.

## B.    Unreasonably Small Capital

The Trustee also failed to prove that the Transfer left the Debtor with unreasonably small capital. The "unreasonably small capital" test is aimed at transfers that leave the transferor technically solvent, but doomed to fail. *MFS/Sun Life*, 910 F.

Supp. at 944; *In re Operations NY LLC*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013).  The

relevant factors include the transferor's debt to equity ratio, its historical capital cushion

and the need for working capital in the transferor's industry.  *MFS/Sun Life*, 910 F.

Supp. at 944; *Operations*, 490 B.R. at 98.

The evidence showed that the Debtor's debt to equity ratio following the Transfer

was favorable to creditors.  "This ratio shows the relationship of a company's financing

provided by creditors to the amount provided by stockholders.  It is an indicator of the

organization's financial cushion, or, in other words, how much the firm could lose in

assets without endangering the creditor's capital."  JAY ALIX & ELMER E. HEUPEL,

FINANCIAL HANDBOOK FOR BANKRUPTCY PROFESSIONALS § 1.9, at 32 (1991) ("ALIX &

HEUPEL").  "The lower the ratio, the more protection the creditors have."  *Id.*  As of

December 31, 2007, only four days after the Transfer, the Debtor's total debt was

$418,328.48 and its total equity was $656,464.78.  (PX 22.)  The debt to equity ratio,

expressed as the decimal 0.64, signified that the Debtor could lose nearly one-third of its

assets before endangering its creditors.  Furthermore, the inventory, a significant asset,

was carried at cost rather than market value, and the amount of equity did not reflect

the closing of the second tranche and the infusion of an additional $700,000 in capital.

The Trustee did not offer evidence of the Debtor's historical capital cushion or the

need for working capital in the Debtor's industry.  Nevertheless, the evidence showed

that the Debtor had a substantial cash cushion and sufficient working capital.  As of

December 31, 2007, the Debtor's total current assets equaled $798,229.34, and its total

current liabilities equaled $418,328.48, or nearly $400,000 less.  (PX 22.)  "*Current

assets* are assets expected to be converted to cash, sold, or consumed during the next

9

twelve months, or within the business's normal operating cycle if the cycle is longer than one year." ALIX & HEUPEL § 9.2, at 354 (emphasis in original). "Current liabilities are those due to be paid within one year." *Id.* § 10.2, at 386. The "current ratio," the current assets divided by the current liabilities, "indicates the extent to which the claims of short-term creditors are covered by assets that are expected to be converted to cash in a period roughly corresponding to the maturity of the claims." *Id.* § 1.7, at 21. While no ratio is a perfect predictor of future liquidity, and in the Debtor's case depended on its ability to sell its inventory within one year, a current ratio of 1.91:1 implies a sufficient cushion to meet current obligations (the Debtor's balance sheet did not list any long term liabilities). And as noted, the inventory was carried at cost rather than at its market value.

Furthermore, the Debtors' cash projections for January 2008 (PX 24) demonstrated that the Debtor expected to be flush with cash by the end of the month. According to the January Cash Projection as of January 7, 2008, the Debtor expected to pay all of its January bills and still have a cash balance of $194,238 at the end of the month.[7] (PX 24.) Furthermore, the cash projections included the $700,000 raised through the first tranche of the Class B unit purchases, but did not include the $700,000 raised through the second tranche. Beginning in late January 2008, the

---

[7]       The Trustee argued that there was no evidence that the Debtor sold the inventory or collected the accounts receivable consistent with the projections. The Trustee had the burden of proof on the issue of "unreasonably small capital" and had access to the Debtor's books and records to prove it. He did not show that the Debtor failed to meet its January projections, and there was no evidence of any projections after then. The Trustee's only witness on this issue, Jack Loprete, left the Debtor's employment in March or April 2008.

10

Individual Defendants and Royal invested an additional $421,765.00, (*see* PX 29), and the Debtor raised the balance of the second $700,000 tranche from other investors.

The Trustee's only contrary evidence is a January 20, 2008 email from Sheldon Ginsburg, Royal's executive vice president and chief financial officer, to David and Mordy Herzog, in which Ginsburg stated that "I know that Mystique is out of money." (PX 26.)  The Trustee's counsel elicited Ginsburg's acknowledgment that he wrote those words, and asked Ginsburg if they were correct, but cut Ginsburg off and Ginsburg never completed his answer to that question.  (Tr. at 78:22-80:11.)  Importantly, Ginsburg did not work for the Debtor, and the source of his information was never revealed.  Given the contrary financial evidence, and the fact that the Debtor did not file its chapter 7 petition until January 22, 2013, or approximately five years after the Transfer, the Court concludes that the Trustee failed to prove that the Transfer left the Debtor with unreasonably small capital or doomed it to failure.

## CONCLUSION

The Trustee failed to prove that the Transfer constituted a constructive fraudulent conveyance under New York law.  Accordingly, his claim to avoid and recover the Transfer is dismissed.  Since the Transfer is not avoidable or recoverable, the subsequent transferee claims and disallowance claims are also dismissed.  The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure made applicable to this adversary

proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  The Clerk of

the Court is respectfully directed to enter judgment dismissing the *Complaint*.

      So ordered.

Dated:  New York, New York
        November 4, 2016

                  /s/ *Stuart M. Bernstein*
                  STUART M. BERNSTEIN
          United States Bankruptcy Judge